9 So.2d 614

**In re CUMMINGS et al.**

No. 34859.

June 29, 1942.

Dissenting Opinion July 2, 1942.

Rehearing Denied July 20, 1942.

See, also, 196 La. 493, 199 So. 402.

Charles A. McCoy, of Lake Charles, Hollingsworth B. Barret, of Shreveport, Frank Wm. Hart, of New Orleans, Eugene A. Conway, of Baton Rouge, and B. Y. Wolf, Chairman, Supreme Court Committee on Professional Ethics and Grievances, of New Orleans, for petitioners.

Cawthorn & Golsan, of Mansfield, for defendant George C. Cummings.

Edward M. Bostick, of New Orleans, in pro. per.

ROGERS, Justice.

This is an original proceeding for the disbarment of George C. Cummings and

Edward M. Bostick. The proceeding was brought on April 5, 1938, by the Board of Governors of the State Bar of Louisiana, created by Act No. 10 of the Second Extra Session of 1934, as amended by Act No. 21 of the Third Extra Session of 1934. The State Bar of Louisiana was dissolved by Act No. 55 of 1940 and pending the creation of the Louisiana State Bar Association in compliance with Act No. 54 of 1940, this court by order issued on August 22, 1940, appointed a committee composed of five members of the Bar, to be known as the Supreme Court Committee on "professional ethics and grievances" to handle all complaints and proceedings for the suspension or disbarment of members of the Bar. 195 La. XLIV.

On September 30, 1940, on motion of the Committee of Professional Ethics and Grievances, this court issued an order substituting the Committee for the Board of Governors of the defunct State Bar of Louisiana and directed the Committee to prosecute the disbarment proceeding brought against Cummings and Bostick. Subsequently, under Section 1 of Article 13 of the Articles of Incorporation of the Louisiana State Bar Association, the Committee on Professional Ethics and Grievances was charged with and conducted the prosecution of the case.

The gravamen of the charge against the respondents as set forth in the petition of the Board of Governors of the State Bar of Louisiana is that respondents attempted to frustrate the conduct of the proper and honest examination of certain applicants for admission to the Bar at the

written examinations which were held in the hall of the House of Representatives of the State Capitol in the City of Baton Rouge, beginning on Monday, March 7, 1938, and continuing for a period of three days.

The activities of Cummings and Bostick which it is charged constitute gross professional misconduct as set forth in the petition briefly stated are as follows:

That Bostick managed to secure in advance the details of the questions on negotiable instruments to be used at the Bar examinations and that he communicated them to William F. Johnson, Jr., an applicant for admission to the Bar; that the questions were subsequently communicated to Cummings, who made a written memorandum of the questions which he exhibited to various applicants for admission to the Bar stating that the bar examinations were a "racket" and that in order for an applicant to successfully pass the examinations it was necessary to "fix" the Board of Governors of the State Bar of Louisiana by money payments, and that if the payments were made to him it would be helpful to the applicants.

That during the week prior to the holding of the examinations Cummings met Charles G. Lee, a prospective applicant for admission to the Bar, in the City of Shreveport. Lee stated to Cummings that he felt he was not sufficiently prepared and that he was planning to postpone taking the examinations; that Cummings represented to Lee that if Lee would pay him $250, Lee would get the help required to pass the examinations; that Lee was impressed by

the proposition made to him and informed Cummings that he could not pay $250 but that he could pay $100, which Cummings accepted. On March 6, 1938, Lee paid Cummings $100, subsequently lent him $20, and paid Cummings' hotel bill in Baton Rouge amounting to $38.

That Cummings made a similar proposition to Robert E. Robinson, an applicant for admission to the Bar; that Cummings first proposed to Robinson that he be paid $500, but Robinson was impecunious and was unable to pay Cummings more than $67.50, which amount was received by Cummings in five installments.

That on March 4, 1938, Leslie E. Kilpatrick, after receiving a similar proposition from Cummings, paid Cummings $250, for which Cummings gave Kilpatrick a receipt typed on the official stationery of the State Bar of Louisiana.

That Cummings accordingly obtained from Lee, Robinson and Kilpatrick a total of $475.50 upon representations that he could help them at the approaching bar examinations.

That during the holding of the examinations Cummings made a similar proposition to another applicant for admission to the Bar but his proposition was rejected by the applicant who refused to have anything to do with the matter.

The petition sets forth in detail the method followed in assisting the applicants who had paid Cummings for the help promised them.

Cummings would secure a copy of the questions in advance of each examination, and using the automobile of the applicant Lee would take the questions to Bostick's hotel room where Bostick would be waiting and that Cummings and Bostick would study the questions and formulate the answers thereto. The applicants in answering the questions propounded by the examiners would use a composition book known as a "blue book", a supply of which Cummings had managed to secure in advance of the examinations. After Cummings and Bostick had formulated answers to the questions, Cummings with the assistance of the wife of William F. Johnston, Jr., one of the applicants, and of a public stenographer, who was employed by Cummings, would write the answers to the questions in a number of the blue books. When the books were completed Cummings, using Lee's automobile, brought them to the Capitol and at a given signal the applicants who had subscribed to the services would proceed to a lavatory in the building where each received a book containing answers to the questions propounded in connection with the examination then in progress. The candidates would then return to the examination room and answer the questions by copying the answers thereto contained in the books they had obtained from Cummings; that on March 15, 1938, the Board of Governors received information that gross irregularities had been committed in the examinations. The President of the Board immediately sent telegrams to the applicants who were suspected of participating in the matter, requesting them to appear at his office as soon as possible for an interview regarding the examinations. In due course,

sworn statements were taken from various persons, including Bostick, and the Board concluding from its investigation that Cummings and Bostick were guilty of gross professional misconduct in connection with the examinations, instituted the present proceeding.

Cummings appeared in person and filed an answer to the petition which answer in effect amounted to a general denial. Bostick also appeared in person and filed an answer denying that he was guilty of such gross professional misconduct as to deserve disbarment, and setting forth in full his connection with the matter.

Under Section 4 of Rule 18 of the Rules of this court, an order was issued on January 13, 1941, referring the case to Richard T. McBride, Esq., a member of the New Orleans Bar possessing the necessary qualifications, as Commissioner, to hear the evidence and to report to this court his findings of fact and conclusions of law. At the first hearing, held in the City of New Orleans on March 24, 1941, Bostick appeared in person, but Cummings, who could not be found, was represented by Henry F. O'Connor, Esq., a member of the New Orleans Bar, who was duly appointed for that purpose by an order of this court. The second hearing before the Commissioner was held in the City of Shreveport on July 24, 1941. At that hearing Bostick represented himself and Mr. O'Connor, the attorney appointed to represent Cummings, was also present, but Cummings appeared personally and advised the Commissioner he desired to appear in his own behalf,

whereupon Mr. O'Connor withdrew from the case.

After the Commissioner had completed the hearing of the evidence and had made his report to this court, in which he recommended that Cummings be disbarred and Bostick be reprimanded, the Committee on Professional Ethics and Grievances filed a motion that the report be confirmed so far as the Commissioner's findings of fact and conclusions of law are concerned as well as the disciplinary action recommended with respect to Cummings. The committee suggested that considering the gravity of the offense committed by Bostick a reprimand would not be sufficient to promote the ends of justice and the committee respectfully requested that the court take such disciplinary action with respect to Bostick as it deems justified by the findings of fact and conclusions of law submitted by the Commissioner. Bostick did not except to the Commissioner's report. On the contrary, in what he designated as an answer to the exceptions and opposition filed by the committee to the report he prays that the findings of the Commissioner be sustained.

Cummings did not except to the Commissioner's report within the time allowed by the Rules. However, on March 18, 1942, he wrote the Commissioner from Jackson, Mississippi, informing him that he had obtained a copy of the report only on March 10, 1942, and requested a short delay be granted him before final action was taken in the matter. The Commissioner filed Cummings' letter in the court, submit-

ting Cummings' request for delay for such action as the court might decide to take thereon. Cummings was granted the delay requested and on March 31, 1942, he appeared in person and filed exceptions to the Commissioner's report, alleging generally that the Commissioner's findings of fact and conclusions of law were erroneous.

On May 6, 1942, the case was argued and submitted on the Commissioner's report and the exceptions filed thereto. The committee was represented at the hearing by Benjamin Y. Wolf, Esq., Chairman, and Charles A. McCoy, Esq., and Frank W. Hart, Esq., members of the committee. Cummings was represented by Joseph T. Cawthorn, Esq., a member of the Bar of Mansfield, Louisiana. Bostick was not represented by counsel but appeared in his own behalf.

Cummings did not testify in his own behalf nor did he appear before the Board of Governors of the State Bar of Louisiana when it was investigating the matter. While Bostick did not testify at the hearings before the Commissioner, he did testify in full before the Board of Governors and he consented that his testimony as given at that time might be used in this proceeding.

The report of Richard T. McBride, Esq., the Commissioner, based on the record as made up before him, contains the following findings of fact, viz.:

"Your Commissioner finds that there were gross irregularities in the bar examinations held on March 7, 8, and 9, 1938, in Baton Rouge, and a conspiracy was planned and executed by which a fair examination of certain candidates seeking admission to the bar was frustrated.

"The evidence shows that shortly after the examinations Mr. Hugh M. Wilkinson, then President of the Board of Governors of the State Bar of Louisiana, received information that some of the candidates taking the examinations had been guilty of cheating, which information resulted in the institution of an investigation of the matter. Statements, under oath, were taken from the candidates suspected of being involved, as well as from others thought to have assisted in the conspiracy. Considering the statements of the various parties, the Board of Governors was justified in bringing the present proceedings, and in making the allegations contained in the petition.

"The Commissioner might state at this point that in finding the facts herein, no statements (with the exception of those of Mrs. Johnson and Bostick) obtained by the Board of Governors from the various witnesses in the investigation have been resorted to, the Commissioner believing that such statements are not proper evidence herein, as the defendants were not present when the statements were made, and had no opportunity of cross examining the witnesses. The defendants agreed, however, that the statement of Mrs. Johnson might be used in evidence, and Bostick consented that his statement might also be so used.

"Bostick testified that shortly before the bar examinations he was employed by an

insurance agency in Shreveport as adjuster, and in connection with his employment it was necessary for him to go to Monroe. That the nature of his assignment in Monroe necessitated his calling upon Mr. George Wesley Smith, a member of the Board of Governors of the State Bar charged with preparing the examination questions on Negotiable Instruments. That Bostick and Mr. Smith conversed generally, and the then forthcoming bar examinations were discussed. During the course of the conversation Bostick asked Mr. Smith 'well, what kind of exam are you giving the boys', and Mr. Smith answered 'What do you think of these', handing Bostick a list of questions on Negotiable Instruments. Bostick read over the questions, and subsequently communicated such details of the questions as he remembered to William F. Johnson, of Shreveport, who contemplated taking the bar examinations.

"Bostick explained that he and Johnson were employed by the same insurance company in Shreveport, and that he assisted Johnson, who was studying law, in the various legal courses, and quizzed him on the different subjects; that during the studies Bostick quizzed Johnson on the questions on Negotiable Instruments, and indicated to Johnson that those questions would be asked in the bar examinations. Bostick denies that he ever communicated the Negotiable Instruments questions to Cummings, but Cummings did get possession of the questions as he imparted them to candidate Charles G. Lee in Shreveport before the examinations. Johnson admitted that he orally received details of the Ne-

gotiable Instruments questions from Bostick, but denies having given same to Cummings. The Commissioner is of the opinion that Cummings obtained the details of the questions from Johnson.

"Cummings, shortly before the bar examinations, called Leslie E. Kilpatrick, of Shreveport, who contemplated taking the examinations, by telephone and asked Kilpatrick if he was 'ready'. By appointment Kilpatrick and Cummings met in a drug store in Shreveport, and Cummings advised Kilpatrick if the latter would pay $250.00 to him he would see that Kilpatrick got 'special consideration' in the examinations; that Kilpatrick was impressed with the proposition, for he went to a bank and increased a note which he owed the bank by $250.00, received that amount, and turned same over in currency to Cummings. Shortly afterwards Cummings handed Kilpatrick a receipt for the payment (Exhibit Committee 7) written on the official stationery of The State Bar of Louisiana, reading as follows:

"'Shreveport, La.,
March 4th, 1938.
"'Received of L. E. Kilpatrick, of Shreveport, the sum of Two Hundred Fifty and no.100 Dollars.
"'(signed) Geo. C. Cummings.'

"Charles G. Lee, of Shreveport, submitted his application to take the bar examinations, and as the time for the examinations drew near, became doubtful of his ability to successfully pass the examinations; that Lee communicated his fears to Cummings and Cummings stated that Lee would be

foolish not to take the examinations, as Cummings would get hold of the questions before each examination and could help Lee. Cummings received $100.00 from Lee for "help" Lee expected to get from Cummings.

"In Baton Rouge during the examinations Cummings told Roy G. Caskey, a candidate taking the examinations, of his plan in helping some of the applicants, and intimated that if Caskey would advance him some money Caskey would be "cut in" on the next days' questions. Caskey refused to have anything to do with the proposition, and thereafter avoided Cummings.

"Cummings is charged in the petition with having received certain payments from candidate Robert E. Robinson. This candidate made a sworn statement before Mr. Wilkinson, but when his testimony was sought to be taken in Shreveport before the Commissioner, he could not remember what he had told Mr. Wilkinson, nor could he recall any of the details in connection with the bar examinations. Robinson claimed that he was a shell shocked war veteran, and at times suffered mental disturbances and loss of memory.

"There is no doubt in the Commissioner's mind that Cummings endeavored to obtain money from various candidates for the examinations upon his representation to them that he could 'help' them in the examinations. It is certain that he received $250.00 from Kilpatrick, $100.00 from Lee, and propositioned Caskey in Baton Rouge. There is no evidence to connect Bostick with the payments, nor has it been intimated that Bostick was beneficiary of any of the payments.

"The evidence is convincing that Cummings' scheme was to 'help' those candidates who were to get his service by furnishing them with prepared answers to each examination.

"It is not clear how Cummings obtained the questions, but immediately after the questions for each examination were distributed to the candidates, Cummings, using Lee's automobile, hastened to the Heidelberg Hotel with a copy of the questions, and would later return to the Capitol with four or five blue composition books similar to those used in the examinations, which contained answers to the questions of the examination then in progress; he would enter the examination room and place the keys to the automobile he had used on Lee's desk; that thereupon those candidates who were to get the benefit of the service would proceed to a toilet in the building where each would receive from Cummings a copy of the answers to the examination; Johnson, Kilpatrick and Lee each admitted receiving such blue books from Cummings in the above manner. That the time consumed by Cummings in carrying the questions to the hotel and returning to the Capitol with the answers would consume about three fourths of the time allowed for each examination, and the candidates receiving the answers from Cummings would have about one fourth of the time left to copy the answers into the blue books which they turned in to the examiner.

"The method of preparing the answers to each examination is fully shown by the testimony, particularly by the statements of Bostick and Miss Vivian Campbell, a public stenographer.

"When Cummings left the Capitol with the questions for each examination, he would take them to Bostick's room in the hotel, where Bostick, Miss Campbell, and Mrs. W. F. Johnson, Jr., the wife of candidate Johnson, were in waiting. Bostick and Cummings would formulate answers to the questions and the two women would write the answers into four or five blue books. On occasions Cummings himself would write answers in blue books. After the answers had been prepared in a sufficient number of the books, Cummings would carry them from the hotel and return to the Capitol where he distributed the books to his subscribers by the method above recited.

"The manner in which the blank blue books used in the hotel room were obtained is explained by Lee, who stated that at the start of the first examination he obtained a supply of the books, took them from the examination room, and handed them to Cummings in the wash room. Bostick explains that on the morning of the first examination there were no blue books in his room, and it was only after Cummings' visit there with the questions for the first examination that he saw any of the books in his room.

"It was necessary for Cummings to work with utmost speed in getting the questions answered, and returning the answers to the Capitol. In order to expedite mat-

ters, he employed Miss Campbell, a public stenographer, to assist in writing the answers in blue books. Miss Campbell states that each day she was paid by Cummings for her services. Mrs. Johnson states that she accompanied her husband, who took the examinations, to Baton Rouge, and that while she was in her room, during the examinations, Cummings called her by telephone asking her to come down to another room in the hotel and help in doing some writing. That she consented and proceeded to the room indicated by Cummings, where she found Miss Campbell, Bostick and Cummings, and assisted in writing some of the blue books.

"Mr. Wilkinson testified that during the course of his investigation of this matter, Robinson turned over to him several blue books which contained answers to examination questions. These books have been received in evidence by the Commissioner and are marked for identity 'Committee 1, 2, 3, 4, 5, and 6' and pertain to the following subjects: Torts, Code of Practice, Negotiable Instruments, Criminal Law, and Civil Code. Miss Campbell testified that the books marked 'Committee 2, 3, and 6' were written by her in the hotel room. Books 'Committee 1 and 4' are in the handwriting of Mrs. Johnson. Both Miss Campbell and Mrs. Johnson testified that the handwriting in book 'Committee 5' was not theirs and the handwriting in that book has never been identified. As the testimony shows that only three parties, namely: Miss Campbell, Mrs. Johnson, and Cummings, wrote answers in the blue books in the hotel room, the Commissioner must

conclude and finds that the handwriting in book 'Committee 5' is that of defendant Cummings.

"The said six books having been turned over to Mr. Wilkinson by Robinson, definitely identifies Robinson as one of the beneficiaries of Cummings' service. Robinson obtained the books from Cummings who brought them from the hotel to the Capitol during the examinations.

"The evidence is convincing that Cummings, for a monied consideration, attempted to assist several of the candidates taking the bar examinations to cheat their way through, and is guilty of a reprehensible act, repugnant to good morals and ethics, constituting gross professional misconduct.

"As to Bostick, the evidence shows that he assisted in the scheme to frustrate a fair examination of candidates for admission to the bar. It was he who obtained a knowledge of the questions on Negotiable Instruments, and substantially communicated the same to Johnson. He went from Shreveport to Baton Rouge prior to the examinations to help Johnson. He remained in Baton Rouge throughout the examinations, and assisted Cummings in formulating answers to the questions of the examinations. The Commissioner, however, believes Bostick's explanation that he remained in Baton Rouge and assisted in the scheme solely because of his desire to help Johnson, his associate, to whom he was indebted for past business favors. Bostick freely admitted his part in the affair and throughout these proceedings has shown a repentant spirit. Mr.

Wilkinson, testified that Bostick was very co-operative in the preliminary investigation, and assisted materially in clearing up the matter. Four reputable members of the bar, appearing as character witnesses for Bostick, testified that he has always borne an excellent reputation for honesty, integrity and truthfulness, and outside the present charge against him, there is no blemish on his character. Bostick, at the time of the occurrence, was but twenty-six years of age, and had been practicing law for only one year."

An examination of the report of the Commissioner shows that he carefully reviewed the issues involved in the case and that his findings of fact are amply supported by the evidence in the record.

So far as Bostick is concerned he has admitted that the findings of the Commissioner are correct and he has asked that the recommendation of the Commissioner that he be reprimanded only be permitted to stand.

So far as Cummings is concerned, although he has filed a general objection to the Commissioner's report, he does not seriously contend that the Commissioner's findings of fact are erroneous. His counsel has made a most moving appeal for leniency and has asked this court not to impose upon Cummings the severe penalty of disbarment.

Counsel for Cummings brings to the attention of the court that Cummings is thirty-eight years of age and that he was admitted to the Bar on March 5, 1937. Counsel stresses the humility and embar-

rassment suffered by Cummings and the fact that after the publication in the press that the investigation by the Board of Governors of the Louisiana State Bar was in progress Cummings voluntarily ceased to practice law and removed to the State of Mississippi where he engaged in other pursuits in order to earn his livelihood.

Cummings was not inexperienced in the ways of life. At the time he became a member of the Bar he was already a man of mature years and should have known, and no doubt did know, that it was wrong for him to procure the questions prepared by the bar examiners and to deliver the questions, together with the appropriate answers, to certain applicants for admission to the Bar. His offense was aggravated by the fact that he demanded and accepted money from the applicants for his so-called services.

As shown by the testimony of Hugh Wilkinson, Esq., President and Member of the Board of Governors of the State Bar of Louisiana, who was in charge of the preliminary investigation in the matter, "the attitude of Cummings throughout this matter was very ugly, and showed that he had no repentant spirit whatever. I sent for him to come to my office during the course of the investigation, and he not only refused to help the committee or give any information to clear up the matter, but he was personally very insolent to myself, who was acting at that time as the president of the Board handling such affairs for the profession, and, in my opinion, Cummings showed a very vicious disposition in the matter, and I think that his attitude, when questioned about his misdeeds, showed signs that made him absolutely unfit to discharge the duties of a lawyer."

Cummings appeared in this proceeding and personally filed his answer, in which he denied, under oath, the charges contained in the petition filed by the Board of Governors of the State Bar thereby imposing upon the Committee of Professional Ethics and Grievances as its successor the onerous duty of summoning and examining witnesses before the Commission in the Cities of New Orleans and Shreveport in order that the case might be fairly and properly presented to this court.

We find nothing in the record to mitigate the offense with which Cummings is charged and of which he has been proven to be guilty. The record makes it clear that Cummings should not be retained as a member of the Bar. He has demonstrated his unfitness for that high office and for the responsibilities which accompany it.

In contrast to the attitude assumed by Cummings, from the time he was first interrogated by Mr. Wilkinson in regard to the matter, Bostick showed a repentant and co-operative spirit. Without any reservations and without any effort to shield himself or to shield anybody else, in the words of Mr. Wilkinson, "he dealt fairly and squarely" with him and was very helpful in his investigation. Mr. Wilkinson testified in part: "I think without Mr. Bostick's attitude and without Mr. Bostick's help, the committee would have had difficulty in ever knowing positively what the facts were, because others were inclined to

evade a little and not tell us what the truth was." In the course of his testimony, Mr. Wilkinson expressed the hope that both the Committee on Professional Ethics and Grievances and the Supreme Court itself would take into consideration the attitude of Bostick and the help that Bostick gave him in bringing his investigation to a successful conclusion.

At the time of the occurrence Bostick was twenty-six years of age and had been practicing law for only one year. Four members of the Bar testified that he had always borne an excellent reputation. Feeling that Bostick was entitled to consideration because of his youth, excellent reputation, repentant spirit and whole-hearted cooperation with Mr. Wilkinson in his investigation of the matter, Mr. McBride, the Commissioner, recommended that Bostick be merely reprimanded for his offense. The Committee on Professional Ethics and Grievances has opposed the recommendation of the Commissioner, on the ground that merely censuring Bostick for his misconduct would not be an adequate punishment. The Committee, however, is not insisting that Bostick should be disbarred, it being the opinion of four of the five members of the committee that it would serve the ends of justice if Bostick were suspended from the practice of law for a definite period.

Bostick did not receive any monetary consideration for his work in assisting certain applicants in their examinations for admission to the Bar. He became connected with the matter, perhaps unthinkingly, because of his desire to help a friend to whom he was indebted for past business favors.

While Bostick's conduct was reprehensible, he has not attempted to conceal or to uphold it by false statements. We are impressed with his apparent sincerity and his desire to make amends for his dereliction. He has learned his lesson and we have every reason to believe from his assertions that the court will never again be called upon to review his conduct, professional or otherwise, in a similar proceeding. Nevertheless, we can not dismiss this proceeding against him with a mere reprimand. Our duty requires that in order to serve as a deterrent to others, to maintain the prestige of the profession, and to retain the confidence and respect of the public in the administration of justice, we should impose some punishment on Bostick more in keeping with his offense.

From the considerations which we have hereinabove set forth, we have concluded to suspend Bostick from the practice of law for a fixed period, believing that such a penalty will fully serve the ends of justice.

For the reasons assigned, the report of Richard T. McBride, Esq., the Commissioner herein, is approved and confirmed as to its conclusions of law and findings of fact, and it is now ordered that the respondent George C. Cummings be disbarred; that his license to practice law be revoked, and that his name be stricken from the rolls of attorneys of this State.

It is further ordered that the respondent Edward M. Bostick be and he is hereby suspended from the practice as an attorney

and counsellor at law and from appearing as such in the courts of this state for a period of two years from the day this judgment becomes final.

Costs of this proceeding are to be paid by the respondents, George C. Cummings and Edward M. Bostick, in equal proportions.

O'NIELL, C. J., does not take part.

HIGGINS, J., dissents in part.

FOURNET, J., dissents.

HIGGINS, Justice (dissenting in part).

Under Article 7, Section X of the Constitution conferring jurisdiction upon this court in disbarment cases involving misconduct of members of the bar, we are granted the greatest latitude in imposing punishment upon the offender. We are authorized to suspend or disbar an attorney who has been found guilty of misconduct. While the power to punish is left to the discretion of the court, there should be reasonable and substantial uniformity in the punishment imposed upon erring attorneys, otherwise the court will appear to be inconsistent.

In the recent disbarment case, In re Lee J. Novo, 9 So.2d 201, we established a policy of leniency to a first offender by imposing upon him a suspension from the practice of law for a period of six months. In the instant case, the defendant Bostick is suspended for a period of two years, and the defendant Cummings is disbarred. The reasons assigned for the difference between the respective punishments inflicted

were that Bostick was 26 years of age; that he had been practicing law about a year; that he previously bore an excellent reputation; that he showed a repentant spirit; that he co-operated with the investigators in the case; that he had entered into the conspiracy to frustrate a fair and honest bar examination through a feeling of friendship for an applicant; and that a former president of the Bar Association, the Commissioner and some of the members of the Committee recommended leniency for him. On the other hand, it is pointed out that Cummings is 38 years of age; that he elected to stand trial rather than plead guilty to the charges; that he did not show the repentant and co-operative spirit displayed by Bostick; that he accepted money for his assistance to some of the applicants, who were taking the bar examination; and that the commissioner, a former president of the bar association, and the members of the Committee recommended that he be disbarred.

The record shows that, while Cummings was older than Bostick, he too had only been practicing law for the same period of time as Bostick; that he had not been in any trouble before; that he previously bore a good name; and that he was sorry for his misdeed and begged the court to be considerate and lenient with him.

Bostick, while at Monroe, when a friend confidentially permitted him to read a set of examination questions on Negotiable Instruments which were to be given the applicants for admission to the bar, without any prompting by Cummings, conceived the idea of resorting to cheating by subse-

quently writing the questions out with the answers and giving them to a young man, who was scheduled to take the examination. Cummings was not implicated in this whatsoever and, therefore, it cannot be said that he in any way enticed Bostick to commit this fraudulent act. The chairman of the Committee on Professional Ethics and Grievances discerned from the testimony and evidence that Cummings was not the sole and only moving spirit in this fraud, because he differed with the other members of the Committee by stating that he thought Bostick and Cummings should both be disbarred. The other members of the Committee disagreed with the Commissioner, who recommended that Bostick be reprimanded because they stated a reprimand is not sufficient punishment for him.

Both Bostick and Cummings had sufficient experience and were old enough to know that what they conspired to do was dishonorable and dishonest. They had an opportunity during a period of several days within which to realize that their undertaking was reprehensible, but, notwithstanding this fact, they persisted in it to its final conclusion, and they have both justly been found guilty of gross professional misconduct.

There is only one real distinction between Bostick's and Cummings' case and that is, that Cummings accepted certain sums of money totalling less than $500 for the help he gave to the applicants taking the examination. This, unquestionably, makes his offense graver than Bostick's. However, the difference between the moral turpitude involved in what these two young men did is not so great as to justify in one case a suspension of two years and in the other, lifetime disbarment.

The mere fact that one of the defendants elected to feebly defend himself against the charges is no good reason why he should be unreasonably penalized any more than that the other defendant should be unduly rewarded for having most reluctantly assisted the Committee after the fraud he practiced had been revealed by others. The Constitution of this State gives the party accused of such misbehavior the right to defend himself in the trial and, therefore, electing to exercise this right (resulting in our Committee and the court having more work to perform than if he had pleaded guilty) should not be too seriously weighed against him. In arriving at the proper punishment to be inflicted, the court should consider the gravity of the offense, the moral turpitude involved, the fact that the defendant previously bore a good name and was a first offender, the chances of the repetition of the misconduct, the defendant's attitude of repentance, and the degree of punishment necessary to protect the bar and the public against unfaithful members as well as the proper discipline of them. If the policy of the court is to be lenient to first offenders, it may also take into consideration any other extenuating circumstances.

In the instant case, although Cummings stood trial and did not co-operate with the Committee, after all of the testimony was taken and the Commissioner's report was made with his recommendations as to both Bostick and Cummings, he (Cummings)

did exactly what Bostick did and that was to throw himself on the mercy of the court. Both men made a plea for leniency and appeared to be exceedingly remorseful for their transgressions.

I am unwilling to hear the plea of one defendant and turn a deaf ear to the other. If it is adequate punishment for Bostick to serve a suspension of two years, then, I can not see any justification for the complete disbarment of Cummings. Under the facts and circumstances of this case, the two decrees imposing the punishment are altogether out of proportion and are entirely lacking in uniformity.

Considering our lenient policy towards a first offender as established in the Novo case, supra (where he elected to stand trial and did not co-operate with the investigators, the Commissioner and the Committee, all of whom recommended he should be disbarred), and the attitude of the court herein to show leniency and compassion to Bostick, I think that Cummings is entitled to the same kind of consideration, leniency and even handed justice.

I am not opposed to treating a first offender with leniency, because by doing so he is afforded an opportunity to turn over a new leaf and rehabilitate himself. This is the humane thing to do in keeping with our fundamental moral and spiritual philosophy. I am not complaining about the court extending leniency to Bostick, but am making the point that our attitude in that respect should be consistent in every case and carried out in our decrees with a fair degree of uniformity.

It is my opinion that if the decree of the court suspending Bostick from the practice of law for a period of two years is adequate punishment, then the punishment of Cummings by disbarment is too severe. It is my view that because of the difference in the moral turpitude and the gravity of the offenses, Cummings' punishment should be a suspension for a greater period of time than Bostick's.

I respectfully dissent in so far as the disbarment of Cummings is concerned.

FOURNET, Justice (dissenting).

I readily agree with the opinion of Mr. Justice HIGGINS that under the facts and circumstances of this case the two decrees imposing disbarment against one member of the bar and suspension of two years against the other are altogether out of proportion.

The Commissioner appointed by this court to hear the evidence in this case found as a fact that " * * * a conspiracy was planned and executed by which a fair examination (held on March 7, 8, and 9, 1938) of certain candidates seeking admission to the bar was frustrated." (Brackets mine.) He concluded that both Cummings and Bostick were guilty, but he recommended that Cummings be disbarred and that Bostick "be sentenced to a reprimand by the Court."

In the majority opinion this court has adopted the conclusion of the Commissioner that both Cummings and Bostick were guilty, as well as the Commissioner's recommendation that Cummings be disbarred. The punishment meted out to Bos-

tick, however, is that of suspension for a period of two years. The reason assigned for the leniency shown Bostick is that " * * * from the time he was first interrogated by Mr. Wilkinson in regard to the matter, Bostick showed a repentant and co-operative spirit. Without any reservations and without any effort to shield himself or to shield anybody else." In this connection Mr. Wilkinson stated: "I think without Mr. Bostick's attitude and without Mr. Bostick's help, the committee would have had difficulty in ever knowing positively what the facts were, because others were inclined to evade a little and not tell us what the truth was." The majority opinion states further: "At the time of the occurrence Bostick was twenty-six years of age and had been practicing law for only one year. Four members of the Bar testified that he had always borne an excellent reputation. * * * Bostick did not receive any monetary consideration for his work in assisting certain applicants in their examination for admission to the Bar. He became connected with the matter, *perhaps unthinkingly,* because of his desire to help a friend to whom he was indebted for past business favors. While Bostick's conduct was reprehensible, he has not attempted to conceal or to uphold it by false statements." Italics mine.

My appreciation of the evidence in the record does not support the conclusion reached by the Commissioner or by the court in its majority opinion. The record shows that Cummings and Bostick had been members of the bar about a year, both having been admitted at the same time, that is, one year prior to the time when the episode which gave rise to this proceeding occurred.

In the first place, a mere reading of Bostick's testimony unmistakably shows that he was not only reluctant to testify and to give any details with respect to the pertinent facts of the case, but that he was very evasive in many instances deliberately concealing facts in an attempt to shield some of the other parties involved, including himself. It was only when he was confronted with the fact that Mr. Wilkinson, who was investigating the matter for the Board of Governors at the time, had complete and detailed information as to what had actually transpired in Baton Rouge, gathered from the statements and confessions of other parties involved in the matter, that he finally admitted as much as he did, and even then it was with much reluctance.

Bostick testified that he and Johnson had offices on the same floor in the Slattery building in Shreveport both working for insurance companies. In answer to the question "Now, who was it that got you into this cheating business at Baton Rouge?" Bostick said: "Well, may I explain it rather than answer it by name? * * * I don't recall just when, but Johnson came into my office one day and made this approach to me: He said that he had quite a few notes that he hadn't been able to study, that he knew I was fairly well up on the stuff, and asked me if I would come down Sunday night (the night before the examinations) and go over the whole Code Courses with him." (Brackets mine.)

He further testified this was about two weeks before the examination and that since he was not going to New Orleans that particular week-end, as was his custom, he answered: "Well, I told him that I wasn't going in that week-end, but *I would be glad to go down with him if he would pay my expenses. * * *.*" Italics mine.

It is interesting to note that about the time Bostick claims he was thus approached by Johnson (about two weeks before the examination), he obtained from the office of a member of the board in Monroe the questions that were to be given by the board (prepared by the attorney from whom they were obtained) on Negotiable Instruments, that is, about February 23. Up to this time, in so far as the record shows, there was no conspiracy in existence to frustrate the giving of an honest examination.

Bostick stated he did not make a copy of the questions on Negotiable Instruments, but that he did retain the substance of the majority of them and although he denies he told any one either what the questions were or about having seen them, not even his friend Johnson, he states he did quiz Johnson thoroughly on the subject matter covered in the questions, suggesting to him that he had better study up on those points. In this he is contradicted by Johnson, who, in answer to the question "From whom did you get those questions?" said "From Mr. Bostick," and in answer to the further question "Do you know where he got them from?" he replied: "He said he got them from someone that was making the questions up."

Despite Bostick's denial that he wrote the questions down or divulged them to any one, we find that Cummings, subsequently, was using these same questions, in skeletonized form, as a means of inducing prospective candidates to join in a scheme to cheat in the examinations, Cummings stating, as testified to by Lee, one of the candidates approached, that he already had the questions to be given on Negotiable Instruments, and that they had been prepared by a member of the board in Monroe and had been secured. Lee also stated Cummings told him Johnson, Bostick's friend, was in on the deal, and that he would be accompanied to Baton Rouge by Bostick. He further testified that he was told the exact manner in which the remainder of the questions would be secured in Baton Rouge and the answers gotten to the candidates. This was the same method that was used later in carrying out the scheme.

Analyzing Bostick's testimony further we find he stated that upon his arrival at Baton Rouge, where he registered under the name of Edward McKinney (which he said he customarily did whenever he was away from his territory without the knowledge of his company), he met a Miss Callahan by previous arrangement; that he and Miss Callahan dined with Mr. and Mrs. Johnson and one of Johnson's relatives from Houston. He positively denied having seen Cummings at all and contended he only learned of the plan to prepare

the answers to the examination questions on Monday morning. He further denied having told Miss Callahan during an automobile drive Sunday night the exact plan which was employed on the succeeding days in carrying out their scheme to assist the candidates for the bar saying: "As I recall, I told her it was to give Johnson a hand. That's the way I believe I explained it." However, when he was informed by Mr. Wilkinson that Miss Callahan in a complete statement made by her told him Bostick had explained the scheme to her on the Sunday night previous to the examinations while they were riding around Baton Rouge, and was asked how she could have found out this information if he (Bostick) had not told her, he said: *"Well, I would like to change my statement on that; I was trying to protect her."* He reiterated, however, that he had gone to Baton Rouge on that Sunday night for the sole purpose of helping Johnson review the Code and that it was his intention all along to return to Shreveport the following morning, or Monday. However, when Mr. Wilkinson said: "Now, I state to you that that is not the truth, because you told Miss. Callahan on this automobile ride Sunday night all about this plan to write these answers," he stated: "Well, *I will change it in this way*—this is the way I remember now, and *I am not certain it is true:* I talked—*I think I talked to Charles Lee.* Lee had been talking to Cummings, I understood. * * * Lee asked me what I was doing in Baton Rouge. I told him that I had come down to give Johnson a hand. Lee evidently thought I meant something besides what I did, but, anyway, he talked a

little. * * * Lee made the statement that one of the boys, as I recall, was going to give the questions to Cummings." In answer to the question "Who was one of the boys that was going to give the questions to Cummings?" Bostick replied: "I don't know; one of the fellows taking the exam; I never had met them, and he seemed to think that was my mission." In answer to the question "What did Lee say was going to be done with those questions when this party, whoever it was, gave the questions out?" he said: "Well, he didn't go into details, but I could assume that they were going to find some way to get the answers to the boys." Italics mine.

Although Bostick's protestation throughout these entire proceedings has always been that he remained in Baton Rouge for the sole purpose of assisting Johnson, when he was asked "* * * following this conversation with Lee, *you had a pretty good idea of what was going to be done,* didn't you?" he answered: "Yes, *but I did not know that Johnson was in any way connected,* and I do not yet know that he was connected with the other boys who were going to be in on it." Furthermore, he never did squarely admit that he had told Miss Callahan of the whole scheme that Sunday night before the examinations, which scheme was subsequently employed in assisting some of the candidates taking the examinations, but he did finally say: *"I may have; I am not certain. If she says I did, I undoubtedly did."* He also admitted that Miss Callahan endeavored to discourage him from his undertaking because she was worried about it. All of

this, be it remembered, took place on Sunday night, the night before the examinations began, although Bostick began by saying he only knew of the scheme the next day (Monday). In addition, we find Bostick denied having told Miss Callahan that Johnson had promised to pay him $50 for helping him with one of the examinations and had agreed to pay him $300 on March 15 following the examinations if he would stay in Baton Rouge and work the entire three days of the examination. However, he admitted he may have said something to Miss Callahan along that line, in order to justify his staying in Baton Rouge, though he says he never intended to stay after that Monday morning. When he was asked "But you did tell Miss Callahan that Johnson had promised you $300.00?" he said: *"I do not remember saying that,* no sir; *emphatically not.* If I said any amount at all, it was only to impress Miss Callahan, and it was not the truth." Italics mine.

However, after Mr. Wilkinson had questioned Bostick thoroughly with reference to the fact that on the Saturday night after the examinations Miss Callahan had cashed a $10 check for him in New Orleans in order that he might pay for soft drinks purchased by him for both of them at Rodriguez' near Newcomb College and suggested in his question that Miss Callahan could not understand why he had no money since he was supposed to have gotten the $300 from Johnson, he answered: *"I do not recall her asking me that. Now, I do not say she did not, because I don't remember.* I may have written her something like that to justify my staying up there." It was then that Mr. Wilkinson turned to Mr. Lambert, an attorney in his office, and requested him to "Ring up old man Callahan and ask him to bring those letters here," Bostick immediately remonstrated saying: "I would rather you not get him over here. *I will admit anything you want me to.* * * * If you will go on, I will tell you just what happened. There was no mention of any money made up to that time." In his answer to the next question, he explains that by "up to that time," he meant up to the Sunday night before the examinations and that up to that time the only money that had been mentioned had been the matter of expense money as between himself and Johnson. Italics mine.

It was after this that Bostick began to explain what happened on Monday night (after he had worked all day with Cummings preparing the answers to the questions in accordance with the pre-arranged plan as explained to Miss Callahan) although he had previously said that according to his pre-arranged plan he was supposed only to coach Johnson Sunday night on the Code and return to his office on Monday. He stated that when he was about to check out of the hotel on Monday night, Cummings requested that he stay until the following day, he (Bostick) replying: "Well, *all right, for five thousand dollars I will,"* to which Cummings countered "Well, I'll tell you what I will do; I will give you $100.00." Explaining his reaction to this counter-offer during his examination before Wilkinson, Bostick

said: *"Naturally I didn't know Cummings, and so I just ignored the offer,* and *probably would have ignored it anyway.* Then Johnson said, 'Well, listen, please stay over and help me out and I will guarantee it.' Well, *at the time I told Johnson I knew it was foolish to accept anything like that from Cummings, that I certainly would not do so from him,* but I would stay over and that it would not—there was no cost involved in it at all." When he was asked the next question: "Wasn't that arrangement on the basis of $100.00 per day?" he said: "Well, that was for Tuesday, you see. Nothing was said about me staying over Wednesday until Tuesday night. As it turned out, I was the 'fall guy.' Do you want me to go on to Wednesday?" When he was told to proceed by Mr. Wilkinson he said: *"Because you know everything else that happened."* Continuing he explained: "So Tuesday night the same thing was said, and Mr. Johnson said, 'Oh, well, I will guarantee it.' Well, I said the same thing again, 'You know very well I will not take any money from you, especially for this,' and I also told Mary Jane (Miss Callahan), too—I told her Sunday night that I certainly would not take any money from Bill or anybody else." Brackets and italics mine. It will be remembered that just previously he had said, in order to justify his staying in Baton Rouge the entire three days of the examination, he told Miss Callahan he was to receive $300 for doing so. Yet in the next breath he testified he had told Miss Callahan he would not have taken money from Johnson or any one else.

There is another answer or Bostick's that speaks for itself. He said: *"Johnson knowing that I had no faith in Cummings, said, 'I will guarantee it,'* and I told Johnson at the time, 'I will stay over to help you out, but I don't want any money in this, and I also don't want anything to do' —by that time I knew that Cummings had a gang in it, and Johnson said 'O.K.' and the next day Cummings was right up there again. Well, I just let it go on. By that time, I wasn't thinking about before or after; it was just a job then." Italics mine.

On this score I find Johnson denied asking Bostick to stay in Baton Rouge or that he offered to either pay him or to guarantee the offer made to him by Cummings. Johnson did admit that he offered to lend Charles Lee $100.

Lee not only testified he had been apprised by Cummings of the fact that Johnson was in on the deal before he left Shreveport, but he also stated he was informed the questions were to be prepared in Baton Rouge by an attorney, whose name was not at the time divulged to him, and that he was also told by Cummings, Johnson would be accompanied to Baton Rouge by Bostick. He further testified that while he was attending a meeting in Johnson's room he agreed to advance Johnson $50 if he would persuade Bostick to remain.

J. Roy Caskey, one of the candidates taking the bar examination, testified that two of the conspirators, in an effort to induce him to join in the scheme, told him of their method of operation and explained

that since they had to pay the attorney preparing the answers to the questions $100 a day, they were running short of funds and he was threatening to quit.

In the face of all of these facts, I cannot quite agree with the conclusions of the Commissioner and the majority opinion that Mr. Bostick was such a willing and helpful witness; that he was not in the scheme for what he could get out of it; or that he did not make any false statements in order to conceal material facts. It is my opinion that the evidence to the contrary is most clear and convincing.

When Mr. Bostick appeared before this court in his own behalf, he represented to us that he had been a most willing witness in helping the committee in its investigation of the entire incident; that his mission to Baton Rouge was for the sole purpose of helping his friend Johnson, to whom he owed a debt of gratitude; and that he had repented. He asked the court to accept the Commissioner's findings of fact, conclusions of law, and recommendations in so far as he was concerned.

In an attempt to refute the suggestion that he had (in order to evade the members of the committee who were investigating this unfortunate episode) left the State of Louisiana and remained in hiding for several days after the matter was brought to light, only returning after he had been traced through the efforts of the police, Bostick denied the inference and stated his mission in Texas, to which state he had gone from Louisiana, was on business and that as soon as he learned that he was

wanted, he immediately contacted Mr. Wilkinson by long distance telephone and, without further delay, drove to Mr. Wilkinson's office in New Orleans the next morning.

However we find that when Bostick was examined by Mr. Wilkinson in his office on the day of his arrival from Texas, he was questioned with respect to his movements during the entire time that Mr. Wilkinson was using every means at his command to locate him (Bostick) and analyzing his testimony on this phase of the case, we can readily ascertain whether or not he was evading Mr. Wilkinson and whether or not he proceeded to New Orleans as soon as he learned he was wanted to give his version of what took place in Baton Rouge on these three eventful days.

Bostick admitted knowing that the men from Shreveport who had taken the bar examinations, including Johnson, had received telegrams from Mr. Wilkinson advising them to go to New Orleans, having heard of it first from his secretary and later from Johnson himself. (It is not quite clear just whose secretary is referred to throughout this part of the testimony, whether Bostick's, Johnson's, or the secretary of both.) He said he had a conversation with Johnson about the matter and they had agreed that "possibly they discovered something was amiss." Sometime later, he said, Johnson called and advised him of the exact nature of the telegram sent by Wilkinson, saying it was "something about what you thought," that is, "that they had discovered that something was wrong." All of this took place

prior to the time Johnson left for New Orleans. Bostick admitted he was in Texas at the time the discovery of the fraud was publicized in the Shreveport newspapers in large headlines. He first stated that while in Texas he communicated with Johnson through his secretary and kept Johnson posted of his whereabouts because he was constantly moving around. It now becomes evident that Bostick's testimony is full of inconsistencies and contradictions, for he later declared that he did not think Johnson's secretary knew where he was, although he did think that maybe he had told her he was going to be at the home of a friend of his in Alvin, Texas, whom Johnson knew he visited frequently. He then turned his story around, this time stating Johnson knew where he was because he had gotten the information from the house where he (Bostick) lived in Shreveport, Bostick contending he had left word with some one in the household as to where he could be located. When he was informed by Mr. Wilkinson that attempts had been made to locate him through inquiries at his home and that no information could be obtained, Bostick said: "Well, I will have to thank them for sticking by me, even though it did inconvenience you."

It is apparent that Bostick was staying with his friend at Alvin, Texas, and not moving around. He remained there, as he first said, from the time he went to Texas until he discovered he was being traced. Bostick next stated he had never called Johnson, but that Johnson had called him, having obtained the information as to his whereabouts first one way and then another. His story after that story was to the effect that he called his landlady in Shreveport and had her call Johnson and tell Johnson where to call him, admitting that the purpose of his call was to discuss with Johnson what he should do. He stated that during the telephone conversation Johnson advised him not to return to Louisiana. He also stated the reason he did not communicate further with Johnson was because Johnson warned him the wires were being tapped. Finally we find Bostick admitting, when he was pressed by Mr. Wilkinson who asked him a number of suggestive and pointed questions, that he had actually met Johnson in Longview, Texas (to which place Johnson was accompanied by Bostick's landlady from Shreveport, by appointment and had there talked the matter over with Johnson). This was on the Monday following the Saturday when he left Shreveport, or two days after the story of the discovery of the fraud was carried in the Shreveport newspapers. The entire topic of conversation during this meeting was what was best for Bostick to do under the circumstances, he being advised by Johnson not to go to New Orleans. It was after this meeting that Johnson sent Bostick $20 in cash in an envelope addressed to Bostick's friend in Alvin, Texas.

After he was asked several leading and suggestive questions by Mr. Wilkinson, Bostick admitted that it was during the conference with Johnson at Longview, Texas, that he wrote out his resignation from the Maryland Casualty Insurance Company, which resignation was predated February 15, 1938, and was to take effect

March 1 following. This resignation, written on hotel stationery, was handed to Johnson to be mailed to the company in Shreveport, Bostick's explanation of his action being as follows: "And frankly, I didn't want them to give out any information, or have to give any, so I pre-dated it so that they could say, if they wanted to, that I hadn't worked there the last few days." In answer to the question "In other words, you were apprehensive that you might be traced through the Maryland Casualty Company?" he replied: "Yes, sir."

If all of the foregoing does not prove that Bostick was hiding out in Texas and evading Mr. Wilkinson (as against his protestations that he returned to New Orleans immediately upon learning that he was wanted), I think that it is impossible to get around his admission that after he discovered his telephone calls were being traced, he left Alvin, Texas. This was two days before he finally went to New Orleans.

On this phase of the case Mr. Wilkinson testified that he went to Shreveport and tried to find Mr. Bostick, going to Johnson's office, Johnson giving him no information except that Bostick was in Texas, and that it was only by using the license number of Bostick's automobile that he was able to have him traced to Longview, Texas, where he had had a conference with Johnson only the night before the day on which Wilkinson quizzed Johnson about Bostick's whereabouts. Mr. Wilkinson stated it was only after he had finally located Mr. Bostick at a tourist camp in

Houston, Texas, through the efforts of the New Orleans and Houston police, and Bostick finally decided to come out of hiding and call him.

It is my opinion, therefore, that Bostick's conduct throughout the trial of this case does not justify the findings of fact and the conclusions of the Commissioner as expressed in the majority opinion of this court. Nor does it justify the leniency showed to Bostick and the lack of leniency showed to his co-conspirator Cummings, who is being disbarred.

I am not contending that both of these defendants should be disbarred, for, as was pointed out in the Novo case, 9 So.2d 201, handed down May 25, 1942, where we quoted with approval the opinion of Justice Field of the United States Supreme Court in the case of Bradley v. Fisher, 13 Wall. 335, 10 L.Ed. 646, to the effect that "A removal from the bar should * * * never be decreed where any punishment less severe—such as reprimand, temporary suspension, or fine—would accomplish the end desired," and Thornton on Attorneys at Law to the effect that "It is a generally accepted principle * * * that since the primary purpose of a disbarment proceeding is not punishment, but the protection of the courts and the public, disbarment should never be decreed, if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney's conduct and character may undergo reformation" (Vol. 2, Section 894), a policy of leniency should be followed in cases of first offenders. What I am contending is that the sentence meted

out to one of the defendants in this case should also be meted out to the other.

The suggestion that Bostick bore an excellent reputation until this unfortunate occurrence applies with equal force to Cummings. According to the record Cummings was only admitted to the bar a year before the Baton Rouge episode (at the same time, as a matter of fact, as Bostick) and one of the prerequisites for his admission was that his character and reputation in the community be excellent. There is nothing in the record to show that the contrary was true.

I therefore respectfully dissent.